[Civ. No. 67252. Second Dist., Div. Five. Oct. 25, 1983.]

A-MARK COIN COMPANY, Plaintiff and Appellant, v.
GENERAL MILLS, INC., et al., Defendants and Respondents.

COUNSEL

Swerdlow, Miller, Seal & Swerdlow, Swerdlow, Glikbarg & Swerdlow, Harry B. Swerdlow and James L. Seal for Plaintiff and Appellant.

Robert S. Daggett, Timothy A. Meltzer, Brobeck, Phleger & Harrison, Dolman, Wolfe & Linden and Jay A. Woollacott for Defendants and Respondents.

## OPINION

**FEINERMAN, P. J.**—A-Mark Coin Company (A-Mark) appeals from a judgment after a court trial denying it any relief in its suit against respondents General Mills, Inc. (General Mills), Bowers & Ruddy Galleries, Inc. (Bowers & Ruddy), Rare Coin Galleries (Rare Coin), James F. Ruddy (Ruddy), Q. David Bowers (Bowers) and Joel Rettew (Rettew). A-Mark's suit against respondents was based on allegations of intentional interference with a contractual relationship and with an advantageous business relationship.

There is no dispute as to the essential facts giving rise to the lawsuit, and, accordingly, we summarize those facts as found by the trial court.

### FACTS

A gentleman named La Vere Redfield died in 1974, a resident of Nevada. He left a sizeable estate which included a collection of slightly less than 500,000 United States silver dollars, some in uncirculated condition and some having numismatic value to collectors and dealers in rare coins (the Redfield collection). Mr. Redfield's will was admitted to probate, and his estate, including the Redfield collection, became subject to probate administration under the supervision of the Second Judicial District Court of Nevada for the County of Washoe (the probate court).

A-Mark is, and was at the times pertinent, a corporation engaged in the business of buying and selling rare coins at wholesale. A-Mark is owned and controlled by Steve Markoff (Markoff), its president and chief executive officer and the sole stockholder of A-Mark Financial, Inc., a corporation of which A-Mark is a wholly owned subsidiary.

In early 1975, Markoff learned of the Redfield collection and initiated efforts to purchase it from the Redfield estate. At first Markoff had little success in finding out anything about the collection. Stack's, a firm retained by the estate to appraise the coins, told the three executrices that general disclosure of information regarding the coin inventory might depress the market price. Later in 1975, Markoff persuaded the estate representatives to permit him to inspect the collection and negotiate for an agreement to

purchase it on condition that he enter into an "Agreement Regarding Non-Disclosure of Confidential Materials."

On October 29, 1975, attorneys for the estate's three executrices filed a petition for instructions regarding sale of personal property in the probate court. The petition sought instructions authorizing either a public sale of the coin collection pursuant to Nevada Revised Statutes section 148.190[1] or a private sale pursuant to Nevada Revised Statutes section 148.170.[2] On November 4, 1975, the probate court entered an order authorizing the executrices to sell the coins at private sale pursuant to Nevada Revised Statutes section 148.170.[3]

A-Mark, through Markoff, then signed a written agreement with the executrices to purchase a portion of the Redfield collection for approximately $5.9 million.[4] The agreement was executed on December 17, 1975, and provided that "[t]he purchase and sale of the Coins shall be consummated at a Closing . . . to be held at Reno, Nevada, at 10:00 a.m. . . . on January 19, 1976. . . ."

Respondent Rare Coin is, and was in 1975-1976, a corporation engaged in the business of buying and selling rare coins at retail. Respondent Rettew, a 50 percent owner of Rare Coin, learned of the existence of the Redfield collection in September of 1975 from a Reno physician who was also a coin collector. Rettew, in an attempt to learn more about the collection, con-

---

[1]Nevada Revised Statutes section 148.190 provides: "1. Except as provided by NRS 148.080, 148.170 and 148.180 and in summary administration under chapter 145 of NRS, the executor or administrator may sell personal property of the estate only after he has caused notice to be published at least 10 days before the sale in one or more issues of a newspaper published in the county where the proceedings are pending, if there is such a newspaper; if not, then in one having general circulation in the county. The notice shall include the time and place of sale, and a brief description of the property to be sold. [¶] 2. Public sales must be made at the courthouse door, at some other public place, at the residence of the decedent or at a place designated by the executor or administrator; but no sale may be made of any personal property which is not present at the time of sale, unless the court shall otherwise order."

[2]Nevada Revised Statutes section 148.170 provides: "Perishable property and other personal property which will depreciate in value if not disposed of promptly, or which will incur loss or expense by being kept, and so much other personal property as may be necessary to provide the family allowance pending the receipt of other sufficient funds, may be sold without notice, and title shall pass without confirmation; but the executor, administrator or special administrator is responsible for the actual value of the property unless, after making a sworn return, and on a proper showing, the court shall approve the sale."

[3]In the November 4, 1975 order, the probate court found that the coin collection "constitutes personal property in the nature of 'perishable' property or 'other personal property which will depreciate in value if not disposed of promptly or which will incur loss or expenses by being kept' as those terms are used in NRS Section 148.170. . . ."

[4]The portion of the Redfield collection which was to be sold to A-Mark pursuant to the purchase agreement had been appraised by Stack's at $5.2 million.

tacted one of the executrices, Luana Miles.[5] Mrs. Miles advised Rettew to employ Nevada counsel and seek an opportunity to bid on the coins.

Rare Coin, lacking ready funds to purchase the collection, approached respondent Bowers & Ruddy[6] with the idea of forming a joint venture to investigate, bid for and purchase the Redfield collection. Bowers and Ruddy made it clear to Rare Coin that General Mills and Bowers & Ruddy could not participate formally or be named in any bid until authorization had been received from General Mills committing General Mills' funds to purchase the coins. A written joint venture agreement between Rare Coin and Bowers & Ruddy was entered into on December 23, 1975.

An attorney representing the joint venture wrote a letter to the attorney for one of the executrices expressing the joint venture's interest in the possible purchase of the coins and suggesting "some possibility that an exchange can be entered into for General Mills stock which might result in favorable tax consequences for your clients." At the time, General Mills had not authorized anyone to offer its stock to purchase the Redfield coins nor was it the custom or practice of General Mills to purchase inventory in exchange for stock. In fact, however, this letter was unavailing, and the estate's attorneys refused to give the joint venture's attorney any information regarding the Redfield collection.

On December 22, 1975, Rettew contacted Harvey Stack, a principal in Stack's, the firm retained by the estate, to appraise the Redfield collection. Although Stack refused to give Rettew any information about the collection, Rettew did learn of a dispute between Stack's and the estate concerning the $250,000 appraisal fee claimed by Stack's. In December 1975, Bowers of Ruddy & Bowers also contacted Harvey Stack in an attempt to gain information about the collection, knowing that Stack had already refused Rettew.

On December 31, 1975, Rettew for Rare Coin, and Bowers for Ruddy & Bowers, signed a letter agreement addressed to Stuart Jackson, the attorney for Stack's, which provided, in part, as follows: "For providing a professional opinion as to the value of and for giving us the method of evaluation of the coins in the Nevada estate of La Vere Redfield, without specifying

---

[5] The trial court found that: "There is no evidence that any defendant ever contacted an Executrix of the Estate seeking to purchase the collection, with the exception of Rettew's communication with Mrs. Miles." The trial court also found that prior to Rettew's contact with her, Mrs. Miles had expressed her opinion to the probate court that public sale might bring a higher price for the Redfield collection.

[6] Respondent Bowers & Ruddy is and was during 1975-1976 engaged in the business of buying and selling rare coins at retail and has been since 1974, a majority-owned subsidiary of respondent General Mills. Respondent individuals Bowers and Ruddy were senior officers and employees of Bowers & Ruddy.

specific dates and mintmarks of the coins in question, Bowers and Ruddy Galleries, Inc. and/or Rare Coin Galleries, Inc. (Joel Rettew) will pay in total to Stack's a consultation fee of $250,000.00 if either Bowers and Ruddy Galleries, Inc. or Rare Coin Galleries acquires the coins in the Redfield estate from the Nevada court, heirs, attorneys, or executors of the estate. Should such estate not be purchased by us, then no fees of any kind are due or payable." Stack's then provided Bowers & Ruddy and Rare Coin with certain information about the collection which Stack's had not furnished to anyone else. Bowers and Ruddy used this information to persuade General Mills to authorize funding a bid for the Redfield collection.

On December 18, 1975, the joint venturers filed a petition for order to inspect personal property (the Redfield collection) and for leave thereafter to bid thereon. At that time, Rettew of Rare Coin knew that the Redfield estate had already signed an agreement to sell the Redfield collection to A-Mark.

On December 22, 1975, Rare Coin filed a petition to enjoin the private sale to A-Mark and a conditional bid to purchase the collection for 10 percent more than the A-Mark price, assuming the A-Mark price was $6 million. At the time that Rare Coin and Rettew submitted this conditional bid, Rare Coin did not have a commitment of funds sufficient to enable it to honor the bid had it been accepted. This fact was not disclosed either to the estate representatives or to the probate court.

On December 31, 1975, Rare Coin sent mailgrams offering to pay up to $6.6 million for the Redfield collection and removing the six written conditions included in its prior offer. At the time, Rare Coin still did not have a commitment of funds sufficient to enable it to honor this bid. As of December 31, 1975, the board of directors of General Mills had not yet adopted a formal resolution authorizing the submission of any bid or offer to purchase the coins, but such authorization was then contemplated, and, in fact, was later given.

On January 2, 1976, Rare Coin and Bowers & Ruddy filed an amended bid offering, on certain conditions, to purchase the Redfield collection for a sum 10 percent in excess of the bid received from A-Mark. On January 9, 1976, the joint venturers filed a second amended bid which was unconditional, in the amount of $6,501,156 and was accompanied by a bank cashier's check in that amount.[7]

---

[7]General Mills provided the funds for the cashier's check in the amount of $6,501,156. On or after January 2, 1976, senior management of General Mills authorized Bowers & Ruddy to commit up to $7 million of General Mills' funds to purchase the Redfield collection. Corporate authorization for this was formalized by the board of directors of General Mills later in the month.

The executrices of the Redfield estate attempted to stop respondents' attempts to put in a bid for the purchase of the Redfield collection. On December 29, 1975, the executrices filed a motion to dismiss respondents' petition for order to inspect personal property, and on January 8, 1976, they filed a motion for order rejecting bid to purchase personal property.

On January 9, 1976, the probate court held a hearing on all these matters. The respondents' unconditional bid in the amount of $6,501,156 was presented to the court. The probate court vacated and set aside its order of November 4, 1975, authorizing the private sale of the Redfield collection, and declared the purchase agreement of December 17, 1975 between A-Mark and the estate to be void *ab initio* and of no force and effect.[8]

The probate court's order was based on expressed findings which are in part as follows:

"3. No sale under the Agreement of December 17, 1975 has taken place. The terms and conditions of the Agreement have not, as yet, been performed by either party, and the coins have not been transferred to A-MARK COIN COMPANY, INC., nor has any title to the coins passed to said prospective purchaser. No portion of the purchase price specified in the Agreement has been paid by A-MARK COIN COMPANY, INC. to the Estate.

"4. This court has continuing jurisdiction over the administration of this Estate, including all sales of property owned by the Estate. This Court has the obligation to assure that the best price which may be obtained for Estate property is, in fact, received and that no property be sold for less than the best price obtainable. Until the title to the Estate property passes, the Court retains the authority to determine the manner in which said property shall be sold.

"5. The Court finds that its Order of November 4, 1975 was erroneously entered and that a sale under NRS 148.170 is not appropriate and is not in the best interests of the Estate and will result in the sale of Estate assets at less than the best price obtainable, if said Order remains in effect. The Order of November 4, 1975 should be vacated and held void ab initio.

---

[8]In making its ruling the probate court stated in part, "Gentlemen, what has transpired here this morning was not anticipated by anyone, including the court. I refer to the filing of an unconditional bid with the full amount tendered without prior examination and inspection of the coin inventory. . . . However, the events which have transpired in this court this morning have demonstrated as an actual fact that this court's November 4, 1975 order was made and entered upon an apparently erroneous assumption, and all the fears upon which the order was based have now been effectively eliminated by the Bowers and Ruddy Galleries, unconditional bid, as stated."

"6. NRS 148.170 is not applicable to the sale of the coin collection of 407,596 silver dollars constituting the first two (2) items of the Inventory and Appraisement of Benjamin Stack. The said coin collection should be sold pursuant to the provisions of NRS 148.190.

". . . . . . . . . . . . . . . . . . . . . . .

"8. It is the duty of the Court to see that the Estate receives the highest price obtainable for said coin collection, in order to protect creditors of this Estate and those persons ultimately entitled to distribution of the assets thereof. If the Executrices of the Estate are permitted or required to sell said coins to A-MARK COIN COMPANY, INC. in accordance with the Agreement of December 17, 1975, the Estate will not obtain the highest price for said coins.

"9. The Agreement between the Executrices of the Estate and A-MARK COIN COMPANY, INC. of December 17, 1975, was entered into by the Executrices in good faith, under the authority and the instructions of the Order of this Court of November 4, 1975. Since that Order of November 4, 1975 is vacated ab initio and made void by this Order, prior to the completion of any sale pursuant thereto, the said Agreement of December 17, 1975 is void and of no force and effect." The probate court accepted respondents' bid of $6,501,156 subject to a public sale of the coins which was ordered to be held on January 27, 1976.

A-Mark appealed from the probate court's order, and the Supreme Court of Nevada affirmed the order in all respects.[9]

The public sale of the Redfield collection took place in the probate court on January 27, 1976. The high bidder was A-Mark with a last bid of $7.3 million for the collection. The following day the probate court confirmed the sale to A-Mark by entry of an order for confirmation of sale of personal property.

A-Mark paid over $1 million more for the Redfield collection than the price called for in the December 17, 1975, purchase agreement between A-Mark and the estate.

Based on the above stated facts, the trial court in this matter concluded that A-Mark never had a valid contract with the Redfield estate for purchase of the Redfield collection with which defendants could have interfered and

---

[9]The appeal is reported as *A-Mark Coin Co., Inc.* v. *Redfield's Estate* (1978) 94 Nev. 495 [582 P.2d 359].

that "the conduct of defendants in seeking to bid on the coins did not constitute any actionable tort against A-Mark." The court also concluded, in the alternative, that A-Mark's alleged cause of action for interference with contract "is barred by the two-year period of limitations provided in Section 339(i) of the Code of Civil Procedure."

## DISCUSSION

### Interference With the Alleged
### Contractual Relationship

█ "An action will lie for the intentional interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification." (*Herron* v. *State Farm Mutual Ins. Co.* (1961) 56 Cal.2d 202, 205 [14 Cal.Rptr. 294, 363 P.2d 310]; *Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33, 35 [112 P.2d 631]; *Winn* v. *McCulloch Corp.* (1976) 60 Cal.App.3d 663, 672 [131 Cal.Rptr. 597].)

A-Mark argues on this appeal that "defendants' interference with the plaintiff's contractual relationship with the Redfield Estate was not justified because their conduct is contrary to the public interest and threatens the sanctity of contractual relationships between estates and bona fide purchasers of estate property." A-Mark's lengthy analysis on this topic is largely irrelevant, ignoring, as it does, the fact that the trial court found that there was no contractual relationship between A-Mark and the Redfield estate. █ The trial court concluded that the December 17, 1975, agreement was wholly void, and we find that that determination was supported by substantial evidence. In *A-Mark Coin Co., Inc.* v. *Redfield's Estate, supra,* 582 P.2d 359, the Nevada Supreme Court affirmed the probate court's power to annul its order directing a private sale of the Redfield collection and to direct, instead, a public sale. In making that order, the probate court had declared its original order and the contract between the estate and A-Mark to be void *ab initio.* The Nevada Supreme Court stated (582 P.2d at pp. 360-361): "It is irrelevant whether Rare Coin Galleries and Bowers & Ruddy Galleries had standing to object to the private sale and themselves submit a bid. Their bid, whether properly submitted or not, caused the probate court to realize that the best interests of the estate would be served by a public sale rather than a private sale. Therefore, on its own initiative, the court annulled its order authorizing a private sale, and directed a public sale. [¶] A probate court has jurisdiction to vacate a prior order upon learning that it was entered through mistake. [Citation.] . . . The court may initiate relief from such an order on its own motion. [Citations.] The court below was sensitive to its obligation. Its candor and wis-

dom in correcting an apparent mistake benefited the estate by $1,389,858. Its power to act as it did is established and, in our view, beyond question."

In comment f. to Restatement of Torts 2d, section 766 it is stated: "The word 'contract' connotes a promise creating a duty recognized by law. (See Restatement Second, Contracts § 1.) The particular agreement must be in force and effect at the time of the breach that the actor has caused; and if for any reason it is entirely void, there is no liability for causing its breach."

The concept that a contract subject to court approval or other governmental confirmation, and not yet approved or confirmed, is not sufficient to support a claim of tortious interference with contract has been recognized in several cases. In *Bank of America* v. *County of Los Angeles* (1969) 270 Cal.App.2d 165 [75 Cal.Rptr. 444] (disapproved on grounds not pertinent here in *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 52, fn. 5 [104 Cal.Rptr. 1, 500 P.2d 1345]), an estate brought an action against the County of Los Angeles for tortious interference with the sale of an airport which was an asset of the estate. On June 20, 1963, the estate contracted to sell the airport to Valiant Investment Company for $2,030,000, subject to confirmation of the probate court. On July 18, 1963, the day before the confirmation hearing, the county board of supervisors voted to condemn the airport property, and a deputy county counsel went to the confirmation hearing and announced the county's intention to condemn the property in open court. Present in court were others who intended to submit higher bids for the property, but, because of the county's announcement, no increased bids were made. The bulk of the opinion in *Bank of America* is devoted to a discussion of the principles of government tort liability and immunity. However, as an alternative ground for its decision absolving the county from liability, the court stated (270 Cal.App.2d at p. 175): "Further, in our opinion, the undisputed facts show no interference, tortious or otherwise, with a contract or negotiations. The contract made with Valiant was subject to confirmation."

In *Bailey* v. *Banister* (10th Cir. 1952) 200 F.2d 683, the plaintiff contracted to purchase Indian land. The agreement for sale required approval from the Secretary of the Interior. Before the sale was approved, defendants notified the Department of Interior that they were willing to bid more for the land if the department would offer the property for sale on bids. The Department of the Interior opened the purchase to competitive bidding, and plaintiff was the highest bidder at a price approximately $9,000 more than the original contract price. Plaintiff sued claiming that defendants had intentionally interfered with a contractual relationship. In affirming the dismissal of plaintiff's complaint, the Court of Appeal stated (200 F.2d at p. 685): "Until the sale was approved, the plaintiff had acquired no legal

right to demand the delivery of the deed, and the defendants or anyone else had the right to compete with the plaintiff for the purchase of the land regardless of their motives. [Citations.] . . . [¶] The right to recover for the unlawful interference with the performance of a contract presupposes the existence of a valid enforceable contract. [Citations.] Since the plaintiff was without an enforceable contract, the defendants did no more than what they had a legal right to do, that is, offer more money for the land."

Finally, in *Brause v. First National Real Estate Trust* (1966) 25 App.Div.2d 624 [267 N.Y.S.2d 876]; affirmed 26 N.Y.2d 737 [309 N.Y.S.2d 38, 257 N.E.2d 287], the New York court held that an action for inducing breach of contract could not be predicated upon attempts to overbid on estate property as long as the probate court has retained jurisdiction to accept other bids. The court stated (267 N.Y.S.2d at p. 877): "It was proper and right that the Surrogate should be notified of and receive any and all bona fide offers of a higher price for the property; and, as a matter of public policy, the bidders should incur no liability in connection with any such offers. It is immaterial that the respective purchase offers of the several defendants were made with the intent to deprive plaintiffs of the advantages of the price fixed in the first instance and with the intent to respectively gain personal benefits and advantages for themselves. Under the circumstances, the defendants' acts were not unlawful; it does not appear that the defendants' conduct was fraudulent or dishonest; and there is no allegation that they acted improperly or with the intent solely to injure the plaintiffs without any expectation of economic advantage. Consequently, this action is not maintainable."

In the case before us, the Nevada probate court declared both its original order authorizing a private or negotiated sale and the December 17, 1975, contract entered into under that authority to be void *ab initio*. ■ No rights are enforceable under a void contract. (*Severance v. Knight-Counihan Co.* (1947) 29 Cal.2d 561, 569 [177 Cal.Rptr. 4, 172 A.L.R. 1107]; *Smith v. Bach* (1920) 183 Cal. 259, 262 [191 P. 14]; *Shephard v. Lerner* (1960) 182 Cal.App.2d 746, 750 [6 Cal.Rptr. 433].) ■ The trial court properly held that A-Mark could not posit liability for tortious interference with a contractual relationship upon a void contract. (See *Renaissance Realty, Inc. v. Soriano* (1981) 120 Cal.App.3d Supp. 13, 17-18 [174 Cal.Rptr. 837]; Annot. 96 A.L.R.3d 1294.)

Appellant argues that "the economic relationship between A-Mark and the Redfield estate was entitled to protection from the defendants' interference, regardless of whether the purchase agreement to buy the coins was a valid and enforceable contract."

■ Liability may be imposed for intentional and improper interference with another's prospective contractual relationship or prospective economic advantage. (Rest., 2d Torts, § 766B.) The elements of the tort of interference with a prospective business advantage are: (1) an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of defendant designed to disrupt the relationship, (4) actual disruption of the relationship, and (5) damages to the plaintiff proximately caused by the acts of defendant. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865].)

■ It is unlikely that A-Mark could have a protectible expectancy of future economic benefit in a relationship that was dependent for its existence upon an order that was declared void *ab initio* by the Nevada probate court. (See *Asia Investment Co.* v. *Borowski* (1982) 133 Cal.App.3d 832, 841 [184 Cal.Rptr. 317]; *Worldwide Commerce, Inc.* v. *Fruehauf Corp.* (1978) 84 Cal.App.3d 803, 810-811 [149 Cal.Rptr. 42].) Even if this were not so, respondents' action in petitioning the Nevada probate court to submit a bid on the Redfield collection cannot be termed improper in any way. (Rest., 2d Torts, § 766B, com. a, and § 767.)

In addition, respondents' actions clearly came within the privilege of competition. Restatement of Torts, Second, section 768 provides:

"(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

"(a) the relation concerns a matter involved in the competition between the actor and the other and

"(b) the actor does not employ wrongful means and

"(c) his action does not create or continue an unlawful restraint of trade and

"(d) his purpose is at least in part to advance his interest in competing with the other. . . ." (See *Charles C. Chapman Building Co.* v. *California Mart* (1969) 2 Cal.App.3d 846, 855 et seq. [82 Cal.Rptr. 830].) As was said by Prosser in his treatise on The Law of Torts (4th ed. 1971) § 130, pages 954-955: "The policy of the common law has always been in favor of free competition, which proverbially is the life of trade. So long as the

plaintiff's contractual relations are merely contemplated or potential, it is considered to be in the interest of the public that any competitor should be free to divert them to himself by all fair and reasonable means. . . . In short, it is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability." (Fns. omitted.) So too, in the case before us, respondents were free to lawfully petition the Nevada probate court seeking a chance to bid on the Redfield collection.[10] There is no evidence that respondents' motives were other than to advance their own economic interests in competition with A-Mark.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied November 22, 1983, and appellant's petition for a hearing by the Supreme Court was denied February 1, 1984.

---

[10]Appellant stresses certain actions of respondents which they claim were improper, such as their offer to pay Stack's $250,000 should they succeed in an overbid if Stack's would give them secret information, or respondents' prior bids for amounts not yet authorized by General Mills. Whether or not such conduct was improper, it was clearly not unlawful, and more importantly, none of the acts complained of were the proximate cause of A-Mark's alleged damage. The only thing which caused the Nevada court to act to set aside the November 4 order and the contract entered into pursuant thereto was respondents' last unconditional bid made in open court in support of their petition to so bid.