**MARIN TUG & BARGE, INC., as Owner of the Barge Marin Tenor, Plaintiff,**

**and**

**Jeffrey L. Mudgett; Susan Mudgett, Plaintiffs–Appellants,**

**v.**

**WESTPORT PETROLEUM, INC.; Shell Oil Products Company, Defendants–Appellees.**

No. 99–17154.

United States Court of Appeals, Ninth Circuit.

Filed Jan. 18, 2001

Before: GRABER, FISHER and BERZON, Circuit Judges.

## ORDER

GRABER, Circuit Judge

We certify to the California Supreme Court the question set forth in Part III of this order.

All further proceedings in this case are stayed pending receipt of the answer to the certified question. This appeal is withdrawn from submission and will be submitted after receipt of the California Supreme Court's opinion on the question certified. This panel retains jurisdiction over further proceedings in this court. The parties will notify the Clerk of this court within one week after the California Supreme Court accepts or rejects certification, and again within one week after that court renders its opinion.

### I.

Pursuant to Rule 29.5 of the California Rules of Court, a panel of the United States Court of Appeals for the Ninth Circuit, before which this appeal is pending, certifies to the California Supreme Court a question of law concerning the "wrongfulness" element of the tort of intentional interference with prospective economic advantage. The decisions of the Supreme Court and the Courts of Appeal of the State of California provide no controlling precedent regarding the certified question, the answer to which may be determinative of a cause pending before this court. We therefore respectfully request that the California Supreme Court answer the question presented below. "The court may reformulate the relevant state law questions as it perceives them to be, in light of the contentions of the parties." *Toner v. Lederle Lab.*, 779 F.2d 1429, 1433 (9th Cir.1986) (citation omitted). We agree to follow the answer provided by the California Supreme Court. If the court declines certification, we will "predict as best we can what the California Supreme Court would do in these circumstances."

*Pacheco v. United States*, 220 F.3d 1126, 1131 (9th Cir.2000).

### II.

Jeffrey and Susan Mudgett are deemed the petitioners in this request because they are appealing the district court's ruling on this issue. The caption of the case is:

JEFFREY L. MUDGETT; SUSAN MUDGETT, Plaintiffs–Appellants,

v.

WESTPORT PETROLEUM, INC.; SHELL OIL PRODUCTS COMPANY, Defendants–Appellees. Counsel for the parties are as follows:

For Jeffrey L. and Susan Mudgett: Jeff Mudgett, Gig Harbor, Washington.

For Westport Petroleum, Inc., and Shell Oil Products Company: Ralph A. Zappala and Michael K. Johnson, Lewis, D'Amato, Brisbois & Bisgaard, San Francisco, California.

### III.

The question of law to be answered is:

Is it "wrongful" for purposes of the tort of intentional interference with prospective economic advantage for a defendant in a civil lawsuit to refuse to deal with the plaintiff in that suit when the following circumstances exist: (1) the refusal to deal precludes not only business between the plaintiff and the defendant but also a substantial amount of business between the plaintiff and third parties who do business with the defendant; (2) the refusal to deal is intended to coerce the plaintiff to abandon or settle the lawsuit; and (3) the defendant has sufficient economic power that the refusal to deal could indeed have that effect?

This case is at the summary judgment stage. The answer to this question of law is necessary for this court to determine whether the facts in dispute are material.

## IV.

The statement of facts is as follows:

Jeffrey and Susan Mudgett were from May 1995 to May 1997 the owners and operators of Marin Tug and Barge, Inc., a small barge company that transports petroleum products in and around the San Francisco Bay. This litigation arises from Shell Oil's contamination of one of Marin Tug's barges, the Marin Tenor. The Tenor carried "bunker fuel," *i.e.*, fuel oil moved by barge to waiting ships for use in fueling the ships' engines. Because the diesel engines that power the receiving ships are highly sensitive to abrasives, bunker fuel must meet certain specifications regarding aluminum and silicon oxide content. (Aluminum and silicon oxide are used as catalysts in the refining process.)

In May 1996, pursuant to a contract between Marin Tug and fuel broker Westport Petroleum, the Tenor was loaded with marine fuel oil at Shell's Martinez refinery. Because there were large amounts of alumina and silica in Shell's delivery line, the oil loaded onto the Tenor contained an excess of harmful abrasives and therefore was substandard, or "off-specification." Unaware of the contamination, the Tenor delivered the fuel as planned to the receiving ship, the OOCL Japan, and soon thereafter transported another load of fuel from a Chevron Oil refinery to the vessel Direct Eagle. On June 10, 1996, Marin Tug learned that the fuel delivered to the Direct Eagle was contaminated, and two days later, believing the Tenor was the source of the contamination, took the barge out of service.

In a series of communications over the following weeks, Marin Tug notified Westport that it (Marin Tug) considered Westport liable for contaminating the Tenor, and that Marin Tug thought it necessary to clean the Tenor fully. Westport indicat-

ed its preference that, instead of full cleaning, Marin Tug attempt a less costly "flushing" experiment.[1] Marin Tug agreed, and two flushing voyages were completed on June 25 and June 26.

Westport then hired the firm of Matthews, Matson & Kelly to analyze for metal content samples of the fuel carried on the flushing voyages. Alan Dedman, Operations Manager of that firm, testified at trial that the contaminants remaining in the Tenor had been sufficiently diluted by flushing to permit the barge to return to service. The results from a second survey company, using a different sampling methodology, showed higher levels of contaminants than those found by Dedman.

On July 18, 1996, Marin Tug informed Westport that it planned to remove the Tenor's pumps and prepare for cleaning, a measure Marin Tug deemed necessary in light of laboratory analyses showing deposits of alumina and silica still in the Tenor's bottoms. Westport objected, contending that flushing had sufficiently diluted the contamination to allow safe transportation of fuel, and refusing to bear the costs of Marin Tug's unilateral decision to clean the barge. Cleaning by Marin Tug's dock staff took place between August 1 and August 20, 1996. Afterward, the Tenor was sold to a third party.

On November 27, 1996, Marin Tug filed an Admiralty Limitation of Liability or Exoneration complaint in federal district court.[2] On the same day, Marin Tug commenced a civil lawsuit against Shell Oil and Westport raising various contract and tort claims.

After the civil suit was filed, Shell refused to have further business dealings with Marin Tug, and prohibited Marin Tug from loading fuel at Shell's Martinez refin-

---

1. According to the trial testimony of Shell logistics manager Timothy Cusick, "flushing" involves repeated loading and unloading of fuel in order to stir up and remove contamination. *See* Tr. Trans., Vol. I, at 142.

2. OOCL filed a claim and answer in the Limitation proceeding seeking over $3 million in damages for harm to its vessel Japan resulting from the contaminated fuel. By order dated January 9, 1998, Judge Wilken exonerated Marin Tug and forever discharged it from all liability arising from the contamination.

ery. The effect of Shell's refusal to deal, consequently, was not only that Shell would no longer contract with Marin Tug, but also that Marin Tug could no longer do business with third-party fuel brokers and consumers who otherwise would have hired it to transport Shell oil.

The Mudgetts allege that Shell's action was, in reality, a retaliatory boycott against Marin Tug. More specifically, the Mudgetts claim that Shell intended to "wield[ ] its considerable economic power through the boycott as a tool to resolve this dispute." Brief for Appellant at 23. To achieve this goal, say the Mudgetts, "Shell knew that a third party boycott was essential, due to the fact that any oil sold or purchased by Shell Oil can be moved on barges hired by either the buyer or seller. A unilateral refusal to do business would have been without teeth, and would not have accomplished Shell's goal of forcing [the] Mudgetts to dismiss the suit." Reply Brief for Appellant at 4.

Shell's position regarding the boycott was set out in a letter to Marin Tug dated January 22, 1997. In that letter, Daniel R. Trunfio, Jr., wrote:

> Shell has no desire to "destroy" Marin Tug and Barge. However, we do not choose to expose Shell to the possibility of additional unfounded claims.
>
> We continued to accept Marin vessels at [our] Martinez [facility], both directly and as a carrier for third parties, until you chose to file and serve your suit against Shell. Since that time, we have advised anyone who attempted to send a Marin vessel to Martinez that we no longer accepted Marin Vessels. This is strictly a business decision and not at all based on the characteristics or suitability of the vessels.
>
> Shell categorically rejects your characterization of this decision as illegal. This was a decision made solely by Shell

as a result of the unsatisfactory relationship that has developed between our two companies. Shell has made no effort to influence attitudes or actions of third parties in their potential dealings with Marin Tug so long as Shell Martinez is not involved.

According to Shell, it refused to deal with Marin Tug only after "Marin chose to pursue its claims in court without first attempting to reach a reasonable commercial resolution," leading Shell to choose "not to expose [itself] to the possibility of further unreasonable conduct. To do this it was necessary to refuse Marin vessels at the dock as well as not contract directly [with Marin Tug] for transportation." Declaration of Daniel R. Trunfio, Jr.

In response to Shell's refusal to deal, Marin Tug amended its complaint to allege intentional interference with contractual relations and intentional interference with prospective economic advantage, claiming that "Shell's action is an attempt to force Marin Tug and Barge to dismiss this litigation...." In May of 1997, when Marin Tug and Barge was sold to a new owner, the company assigned its pending causes of action to Jeffrey and Susan Mudgett.

The district court subsequently granted partial summary judgment in favor of defendants in the Mudgetts' tort claims arising from Shell's boycott.[3] The claim of interference with economic advantage failed, according to the district court, because the Mudgetts had not demonstrated that Shell's boycott was "wrongful," as required by California law. In the court's view, Marin Tug failed to establish the legal proposition that Shell's "actions, even if retaliatory, are wrongful...."

The question whether the district court correctly applied California law on this point is presently before this court on appeal.

---

**3.** After bench trial on the remaining causes of action, the court awarded the Mudgetts $38,612.62 in actual damages, holding Westport and Shell jointly and severally liable for breach of contract and negligent trespass, re-

spectively. By memorandum disposition, we affirmed in part, reversed in part, and remanded for the district court to consider whether the Mudgetts are entitled to additional damages.

## V.

We respectfully submit that the question needs certification for the following reasons:

In *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995), the California Supreme Court held that to make out a claim of intentional interference with prospective economic advantage, a plaintiff "must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Id.* at 393, 45 Cal.Rptr.2d 436, 902 P.2d 740. The court, however, expressly declined to define the contours of the "wrongful" element, noting that "the case, if any, to be made for adopting refinements to that element of the tort-requiring the plaintiff to prove, for example, that the defendant's conduct amounted to an independently tortious act, or was a species of anticompetitive behavior proscribed by positive law, or was motivated by unalloyed malice-can be considered on another day, and in another case." *Id.* at 378, 45 Cal.Rptr.2d 436, 902 P.2d 740.

Subsequent decisions from the California Courts of Appeal have set forth interpretations of the "wrongful" standard that appear to be in conflict. *Compare PMC, Inc. v. Saban Entertainment, Inc.*, 45 Cal. App.4th 579, 602, 52 Cal.Rptr.2d 877 (1996) (" 'Defendant's liability may arise from improper motives or from the use of improper means.' ") (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365, 1371 (1978)), *with Arntz Contr. Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal.App.4th 464, 477, 54 Cal. Rptr.2d 888 (1996) ("[O]ur focus for determining the wrongfulness of ... intentional acts should be on the defendant's objective conduct, and evidence of motive or other subjective states of mind is relevant only to illuminating the nature of that conduct."). The precise kind of wrongfulness necessary to trigger liability therefore remains an unresolved question.

Moreover, viewing the facts in this case in the light most favorable to the Mudgetts (because the case is at the summary judgment stage), we are uncertain whether Shell's conduct was contrary to the laws or public policies of the State of California. It is clear as a general matter that "in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant *seeking to increase his own business* may ... refuse to deal with [plaintiff] or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with plaintiff, all without incurring liability." *A–Mark Coin Co. v. General Mills, Inc.*, 148 Cal.App.3d 312, 324, 195 Cal. Rptr. 859 (1983) (emphasis added) (quoting PROSSER, THE LAW OF TORTS § 130, at 954–55 (4th ed.1971)).

*A–Mark Coin*, however, did not speak to whether a defendant is insulated from liability where the refusal to deal is intended to coerce the plaintiff to drop or settle a lawsuit. Although, as far as we are aware, no California court has addressed this question, the lawfulness of a refusal to deal in retaliation for bringing suit has previously been tested in another jurisdiction, with results favorable to Shell. In *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867 (2d Cir.1962), the United States Court of Appeals for the Second Circuit rejected plaintiff's argument that such refusal amounted to a prima facie tort, remarking that a company is "free to select its business relations in its own interest." *Id.* at 872 (internal citation and quotation marks omitted).

At the same time, California courts have recognized that "[c]onstitutional principles, as well as strong public policy, favor open access to the courts for the resolution of conflicts and the redress of grievances." *Kendall–Jackson Winery, Ltd. v. Superior Court*, 76 Cal.App.4th 970, 986, 90 Cal. Rptr.2d 743 (2000); *see also Pacific Gas & Elec. v. Bear Stearns & Co.*, 50 Cal.3d

1164

1118, 1137, 270 Cal.Rptr. 1, 791 P.2d 587 (1990) ("Our legal system is based on the idea that it is better for citizens to resolve their differences in court than to resort to self-help or force.").

In contexts other than this one-employ-ment, for example-the use of private economic power to frustrate judicial resolution of disputes has been deemed contrary to public policy. Thus, in *Gantt v. Sentry Insurance,* 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992), the court held that "an employee who was terminated in retaliation for supporting a coworker's claim of sexual harassment may state a cause of action for tortious discharge against public policy. . . ." *Id.* at 1085, 4 Cal.Rptr.2d 874, 824 P.2d 680; *see also L'Orange v. Medical Protective Co.,* 18 Ohio Misc. 11, 394 F.2d 57, 62 (6th Cir. 1968) ("It manifestly is contrary to public policy to permit an insurance company to use policy cancellation as punishment against a doctor or dentist who appears as a witness to protect the rights of a plaintiff who has been wronged by another member of the profession. If the insurance industry can use the cancellation procedure to keep members of the medical profession from testifying as witnesses, malpractice litigation can be stifled.").

In sum, we are unable to determine whether Shell's alleged conduct is in conflict with the laws or public policies of the State of California and, if so, whether that conduct is "wrongful" for purposes of the tort of intentional interference with prospective economic advantage. We therefore respectfully request that the Supreme Court of California resolve this question.

IT IS SO ORDERED.